Robert L. Starr (183052)
robert@starrlaw.com
Adam M. Rose (210880)
adam@starrlaw.com
Theodore R. Tang, Esq. (313294)
theodore@starrlaw.com
THE LAW OFFICE OF ROBERT L. STARR, APC
23901 Calabasas Road, STE #2072
Calabasas, CA 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Attorneys for Plaintiff
Calabasas Luxury Motorcars, Inc.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALABASAS LUXURY MOTORCARS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GENERAL MOTORS, LLC, AMERICREDIT FINANCIAL SERVICES, INC., and DOES 1 to 10, <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW** |

## INTRODUCTION

1. Plaintiff Calabasas Luxury Motorcars brings this action to remedy and enjoin ongoing antitrust and state law violations which stem from Defendants General Motors, LLC, and Americredit Financial Services, Inc.'s (collectively "Defendants") unfair and anticompetitive conduct.

2. As alleged below, Defendants violated antitrust law and inflicted widespread harm on both new and used automotive dealers; their customers; and the automotive industry as a whole.

-1-
COMPLAINT

3. Specifically, Defendants have conspired to eliminate competition by refusing to allow non-GM dealerships to accept their leased vehicles as a trade-in and refusing to allow consumers to sell their vehicles to non-GM dealerships. Thus, where there was once a robust market for third-party lease payoffs and vehicle trade-ins, Defendants, through their coordinated conduct, have destroyed that competition.

4. Defendants have placed artificial and anticompetitive restrictions on the used vehicle market in order to ensure that they maintain dominance over the entire market for previously owned or leased GM vehicles. As a result of this anticompetitive conduct, Plaintiff and others similarly situated have suffered immense injury.

5. As described further below, Defendants and their subsidiaries, agents, or co-conspirators entered into and implemented an unfair scheme to fix, raise, maintain, or stabilize retail prices for used GM vehicles sold in California. This activity constitutes an unfair restraint of trade in violation of California's Unfair Competition Law ("UCL") pursuant to Cal. Bus. and Prof. Code §§ 17200 et seq.

6. As a result of Defendants' unfair conduct in violation of the UCL conduct, Plaintiff and other members of the class paid artificially inflated prices for used vehicles, or have been entirely prevented from purchasing these used GM vehicles from lessees via third party payoff, or accepting these leased GM vehicles as a trade-in towards the purchase of a non-GM brand vehicle.

7. Non-GM franchise used car dealers, and non-GM franchise new car dealers who accept trade-ins, are direct targets of Defendants' unfair conduct because they are eliminating competition in the secondary market for the purchase, sale or trade-in of used GM vehicles. In seizing control over the secondary market for its leased vehicles, GM has thwarted Plaintiff and other dealers' ability to enter or trade in this market. This is done for no other purpose than to restrict competition and wrongfully enrich GM franchise dealers.

///

# PARTIES

8. Calabasas Luxury Motorcars ("Plaintiff") is a California corporation, with its principal place of business located in Los Angeles, California.

9. Defendant General Motors, LLC ("GM") is a Delaware limited liability company with its principal place of business located in Detroit, Michigan.

10. All acts and omissions of GM's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and GM is therefore responsible to Plaintiff under the doctrine of Respondeat Superior and/or other doctrines.

11. Defendant Americredit Financial Services, Inc. ("AMERICREDIT") is a Texas corporation with its principal place of business located in Fort Worth, Texas.

12. All acts and omissions of AMERICREDIT's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and AMERICREDIT is therefore responsible to Plaintiff under the doctrine of Respondeat Superior and/or other doctrines.

13. Plaintiff is unaware of the true names or capacities of the Defendants sued herein as DOES 1 through 10, inclusive ("Doe Defendants"), and therefore sues said Doe Defendants by such fictitious names. Plaintiff will seek leave of this Court to amend this Complaint to insert the true names and capacities of such Doe Defendants when such information has been obtained. Plaintiff is informed and believes, and based on such information and belief alleges, that each of the fictitiously named Doe Defendants has participated in some way in the wrongful acts and omissions alleged below, and is liable to Plaintiff for damages and other relief to which Plaintiff is entitled.

# JURISDICTION AND VENUE

14. This Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C § 1332(a).

15. This is a civil action in which the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

16. At least one member of the California Class is a citizen of a State different from at least one Defendant within the meaning of 28 U.S.C. § 1332(d)(2)(A).

17. The claims asserted by the putative class, when aggregated as required by 28 U.S.C. § 1332(d)(6), exceeds the sum of $5,000,000 within the meaning of 28 U.S.C. § 1332(d)(2).

18. The number of members of all putative classes alleged herein exceeds 100 in number within the meaning of 28 U.S.C. § 1332(d)(5)(B).

19. The primary defendants are not States, State officials, or other governmental entities within the meaning of 28 U.S.C. § 1332(d)(5)(A).

20. Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the acts or omissions giving rise to this claim occurred in the Central District of California.

21. This Court has supplemental jurisdiction over Plaintiffs' state law claims arising under statutory or common law pursuant to 28 U.S.C. § 1367 because the claims arise from a common nucleus of operative facts such that adjudication of both state and federal claims furthers the interests of judicial economy.

## FACTUAL ALLEGATIONS

22. As a result of the SARS-CoV-2 ("COVID-19") pandemic, there has been a severe disruptions to the global supply chain of motor vehicles.

23. This major squeeze on vehicle production over the past 18 months has resulted in a drastic shortage in supply while, at the same time, consumer demand for vehicles has dramatically risen. Unsurprisingly, this confluence of low supply and high demand has catapulted used and new car prices to record highs.

24. This unprecedented demand for vehicles has created a situation where lessees whose leases terms have not yet expired have found themselves in possession of a vehicle whose market value was worth significantly more than the amounts owed on

their respective lease, as calculated by Civil Code Section 2987. In layman's terms, as a result of high demand, these vehicles did not lose much—if any—value, and there is equity in these lease contracts

25. As a result of this increased equity, consumers are recognizing that they are able to trade-in or sell their vehicle for a significant profit.

## **THE STRUCTURE OF LEASES & VEHICLE TRADE-INS**

26. In structuring a lease payment during the lease's origination process, the "expected depreciation of the vehicle" is one of the main integers in calculating an appropriate monthly lease payment. Another portion of the calculus is intended to cover interest, and another portion is intended to serve as a profit for the lessor. The lease agreement itself will indicate that the vehicle has a residual value at the end of the lease. This residual value is theoretically intended to correlate with the amount of money that the vehicle will be worth at the end of the lease.

27. When the value of the vehicle ends up being higher than the payoff during the term of the lease, or winds up being worth more than the residual value at the end of the lease, then the vehicle has equity. If the vehicle has equity, this is because the lessee was paying more money than was actually necessary to protect the lessor from the expected depreciation of the vehicle's value.

28. In a closed-end consumer vehicle lease, the consumer is always entitled to purchase the vehicle during the term of the lease, or at the end of the lease.

29. Alternatively, the lessee is entitled to trade-in their vehicle during the lease and then use the trade-in as a down payment for the purchase or lease of another vehicle. The vehicle "trade-in" is a common, established transaction in the automobile industry, and it can be utilized towards a down payment when consumers invariably seek to acquire a new vehicle.

30. The vehicle trade-in is vital to consumer vehicle transactions because most consumers lack the liquidity to exercise the purchase option on their own. Furthermore, if a consumer exercises the purchase option on their own, the consumer

will likely have to pay sales tax, which is an avoidable transaction cost when the vehicle is sold to a dealership. Paying sales tax reduces the equity that the consumer has in the vehicle.

31. A practical example of this process occurs when a lessee will take their GM to a non-GM brand dealer; trade in their GM for a new vehicle by transferring their GM lease's purchase option over to the different brand dealer; and the different brand dealer will then utilize the residual value of the "trade-in" towards the consumer's purchase or lease of a new, non-GM vehicle.

32. As a point of emphasis, the practice of "third-party payoffs" or "vehicle trade-ins" is foundational to not only the used car business, but to the lessee's ability to capture any unexpected equity in their vehicles—a privilege implicit in the purchase option contained in every one of Defendants' lease agreements.

33. In fact, the practice of vehicle trade-ins is so common, that California statutorily codified a licensed vehicle dealer's rights and duties with respect to "trade-ins." Specifically, Cal. Vehicle Code § 11709.4 sets forth the manner in which a licensed motor vehicle dealer is supposed to "purchase or obtain a vehicle in trade in a retail sale…[which] is subject to a prior credit or lease balance" if, amongst other things, the dealer "tender[s] the agreed upon amount as provided in the written agreement to the lessor…or to the legal owner reflected on the ownership certificate, or to the designee of that lessor or legal owner within 21 calendar days of purchasing or obtaining the vehicle in trade." (Cal. Vehicle Code § 11709.4(a)(1)).

34. It should be noted that although § 11709.4 does not explicitly vest within all licensed dealers the ability to accept trade-ins, it must necessarily be assumed that the legal right to accept trade-in vehicles must exist. In other words, it would be implausible for the Legislature to regulate dealer conduct with respect to accepting trade-ins if dealers did not have the right to accept, and consumers did not have the right to present, "trade-ins" in the first instance.

35. When, like here, a legislative enactment is silent on the issue of whether a

dealer has the free right to accept vehicle trade-ins, it must be assumed that such an omission does not signal disapproval, but rather, that the conduct is so inherent in the idea of the trade itself, that it requires no statutory affirmation.

36. Similarly, Ca. Civil Code § 2987 discusses a "Lessee's right to early termination of lease contract; conditions; notice." In explaining a consumer's rights, Section (f) states, "Subdivisions (b) to (d), inclusive, do not apply if, prior to the scheduled expiration date specified in the lease contract, the lessee terminates the lease and purchases the vehicle or trades in the vehicle in connection with the purchase or lease of another vehicle."

37. Pursuant to Ca. Civil Code § 2987, consumers have the right to terminate their lease early in connection with the purchase or lease of another vehicle, and when doing so, the money owed to the lessor is the payoff as amortized, based upon the financial structure of the lease.

38. In light of a dealer's statutory right to accept vehicle trade-ins, we now turn to Defendants' unfair and unlawful business practices which form the basis of this Complaint.

## DEFENDANTS' UNFAIR BUSINESS PRACTICES

39. Recently, due to the shortage of vehicles, and due to the rise in used vehicle values, Defendants have willfully sought to place an unfair restraint on trade in violation of California law. Specifically, Defendants have engaged in a pattern and practice of collusive conduct amounting to unfair competition by refusing to allow non-GM dealerships to accept their leased vehicles as a trade-in and refusing to allow consumers to sell their vehicles to non-GM dealerships.

40. By way of example, let us suppose that a consumer who has 10 months left on their GM lease is tired of driving the GM and now wants to lease a different brand vehicle. When that consumer arrives at a different brand dealership and attempts to trade in their vehicle, the different brand vehicle dealer is prevented from accepting the vehicle because GM refuses to allow non-GM dealerships to accept their vehicles

as a "trade-in." The same is true if the consumer attempts to trade in the vehicle, or sell the vehicle, to an independent used vehicle dealership.

41. Instead, Defendants will only allow the consumer to trade in the vehicle with GM brand vehicle dealerships. That is to say, if a person is leasing a GM, they are essentially stuck with a GM, and if they want to capture the equity in their vehicle, or trade-in the vehicle during the lease, they are relegated to dealing strictly with GM. GM brand dealerships thus have a control on the market, harming the fair trade of vehicles in the marketplace.

42. By keeping their vehicles on the "GM Merry-go-Round," GM not only prevents consumers from using the value in their leased vehicles as a trade-in towards the purchase of a competitor-brand vehicle, but they are also preventing dealerships, such as Plaintiff, from exercising their right to purchase these leased vehicles as a trade-in pursuant to Vehicle Code § 11709.4.

43. Not only that, but the "GM Merry-go-Round" serves to prevent consumers from capturing the equity in their vehicle by requiring consumers to trade-in their vehicle at below market value. Disturbingly, GM trades-in the vehicle, then sells that same vehicle as "Certified Pre-Owned." In this regard, Defendants are placing a restraint on trade in an effort to continuing selling their products (Certified Pre-Owned warranty designation and financing), unfairly harming non-GM dealerships, and violating the letter and spirit of California law.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

44. At all times relevant, Defendants and others entered into and engaged in a continuing unfair restraint of trade and commerce, described above, in violation of Business and Profession Code § 17200.

45. These violations consisted of, but were not limited to, a continuing combination, trust, agreement, understanding, and concert of action among Defendants and others to restrain trade by refusing to allow non-GM dealerships to accept leased GM vehicles as a trade-in, and refusing to allow consumers to sell their

vehicles to non-GM dealerships.

46. Defendants have engaged in this unfair conduct for their mutual benefit including, but not limited to (1) ensuring that only GM brand dealerships have access to GM vehicles after they are traded-in or sold at the end of the lease term; and (2) ensuring further profits by reselling these vehicles to other consumers, who will finance the vehicles with AMERICREDIT and who will obtain vehicles that have been designated as certified-preowned vehicles prior to sale.

47. If Defendants' unfair and anticompetitive conduct is allowed to continue unabated, it will result in the elimination of the sale of used GM vehicles at non-GM dealerships. In other words, California residents will only be able to purchase a used GM from a GM dealership because GM will not allow lessees to sell or trade in their vehicle to anyone other than a GM dealership.

48. Defendants allocated their market share in California in order to artificially maintain control over the market for used GM vehicles to the detriment of Plaintiff and the Class.

49. In cornering the used GM-market, actual and future competition between Defendants, Plaintiff, and those similarly situated, will be eliminated, or substantially reduced; prices for GM's used vehicles will rise to levels they would never have risen in the absence of Defendants' unfair and anticompetitive conduct; and Plaintiff and the Class will be unfairly excluded from an entire market of previously leased GM vehicles—thereby leaving them without an adequate remedy at law.

50. At all times relevant, the business activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate trade and commerce.

51. In this case, the agreement and conspiracy between Defendants restricts interbrand competition. This vertical agreement actually operates to act as a restraint between horizontal competitors. Such vertical restraints foreclose competitors, such as Plaintiff and those similarly situated, from entering or competing in the market for

1  used GM vehicles. Obviously, this has the effect of unfairly eliminating GM's
2  competitive threats within the used car market.

3  52. As a proximate result of the Defendants' unfair conduct, Plaintiff and those
4  similarly situated have sustained damages to their businesses and property in an
5  amount in excess of the jurisdictional minimum.

## **GM ADMITS TO ITS WRONGFUL AND UNFAIR CONDUCT**

53. On June 24, 2021, Autonews.com wrote an article stating it obtained a message stating, "GM Financial will stop working with non-General Motors dealerships on off-lease vehicle payoffs starting July 1 to ensure GM dealerships have priority access to the vehicles coming back to market." The article goes on to say that the change was being enacted, "To better support our GM dealers through the current economic environment and the challenges they're encountering sourcing quality pre-owned vehicles." The article states that a spokesperson advised, "This policy would be in place for the remainder of 2021, after which point AMERICREDIT will assess its position on off-lease buyouts."

54. The article also states, "Joe Bartuch, Executive Vice President of U.S. Sales and Credit (for GM Financial) told GM that the captive finance company would notify customers over the coming weeks that the terms of their lease agreement stipulate they are only able to submit a lease purchase request by contacting GM Financial Customer Experience or working with a participating GM dealership."

55. Finally, the article quotes Todd Wenzel, a dealer principal of Michigan Group, as saying, "GM moved quickly to address dealer concerns about outside brands scooping up off-lease inventory." The quote goes on to say, "GM Financial heard what the GM dealers wanted, and they reacted very quickly – within days from when the dealer council brought them this issue. If you're not a GM dealer, it might not be the best position. But with inventory so tight on new and used, it's a great move for the GM participating dealer."

///

## FACTS RELEVANT TO PLAINTIFF

56. At all times herein relevant, Plaintiff, a high-end luxury used vehicle dealership, has had numerous putative customers attempt to trade-in their GM vehicles which were still under lease to Plaintiff, or sell their GM vehicles to Plaintiff, only to have Defendants refuse and prohibit any attempt by Plaintiff to accept these vehicles as a trade in. Defendants have refused to allow Plaintiff to pay off the vehicles and take title. Instead, Defendants will only allow consumers to trade-in their vehicles with an authorized GM dealership.

57. Indeed, on November 4, 2021, an employee of Plaintiff contacted GM to inquire about a "trade-in" with a third-party. In response to his inquiry, a representative of GM responded that "MB Dealers are the only ones allowed to pay off an MBFS Lease…No 3rd party payoffs." (See, Exhibit 1)

58. In essence, Defendants have unfairly cornered the used vehicle market by refusing to allow lessees to trade-in their vehicles with anyone other than Defendants' affiliates.

59. Defendants' conduct as alleged herein violates California's Business and Professions Code § 17200 et seq.

60. Plaintiff has suffered damage as a result of Defendants' wrongful and unfair conduct.

61. No adequate remedy exists at law for the injuries suffered insofar as further harm will result to Plaintiff and the Class from Defendants' wrongful and unfair conduct in the absence of injunctive relief. If this Court does not grant injunctive relief of the type and for the purpose specified herein, Plaintiff and the Class will suffer irreparable injury.

62. Plaintiff seeks injunctive relief compelling Defendants' to immediately cease engaging in unfair competition in violation of California law by refusing to allow vehicle trade-ins.

///

-11-
COMPLAINT

## CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action on behalf of itself, and all others similarly situated.

64. The class consists of all non-GM vehicle dealerships in California who have been harmed as a result of Defendants' unfair business practice of refusing to allow third-party payoffs of their vehicles' purchase options.

65. Plaintiff reserves the right to establish subclasses.

66. There is a well-defined community of interest, and the class is readily ascertainable:

    (a) Numerosity: The members of the class are so numerous that joinder is unfeasible and impractical. The membership of the entire class is unknown to Plaintiff at this time. However, the class is estimated to be greater than 100 individuals and the identity of such membership is readily ascertainable.

    (b) Typicality: Plaintiff's claims are typical of the class members with whom it has a well-defined community of interest.

    (c) Adequacy: Plaintiff will fairly and adequately protect the interests of each class member. Plaintiff acknowledges it has an obligation to make known any relationship, conflicts, or differences with any class member. Plaintiffs' attorneys are versed in the rules governing class action discovery, certification, and settlement. Plaintiff has incurred and will continue to incur costs and attorneys' fees to prosecute the action for the benefit of each class member.

    (d) Superiority: Class action adjudication is superior to other methods, as it will achieve economies of time, effort and expense compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner for the entire class.

67. There are common questions of law and fact as to the class (and subclass, if any) that predominate over questions affecting only individuals, including but not limited to whether Defendants engaged in unfair competition, and whether Plaintiff and class members are entitled to injunctive relief enjoining Defendants from

refusing to allow vehicle trade-ins with non-GM dealerships.

# FIRST CAUSE OF ACTION
## VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200
### (Against All Defendants)

68. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the paragraphs above and, to the extent necessary, pleads this cause of action in the alternative.

69. California Business and Professions Code § 17200 prohibits acts of unfair competition, including any "unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

70. As alleged herein, Defendants have engaged in unfair business practices.

71. Plaintiff and Defendants are "persons" as that term is defined in Business and Professions Code § 17201.

72. Defendants violated the UCL by knowingly and intentionally refusing to allow licensed vehicle dealers to accept Defendants' vehicles, which were still under lease, from accepting those vehicles as "trade-ins"—which is Plaintiff's statutory right pursuant to Vehicle Code §11709.4 and Civil Code § 2987.

73. Defendants' business acts and practices alleged herein caused damage to Plaintiff and other putative class members.

74. As a direct and proximate result of Defendants' acts and practices in violation of the UCL, Plaintiff has suffered injury in fact and lost money or property and will continue to do so.

### Unfair Prong

75. An act or act or practice is "unfair" if the consumer injury is substantial; is not outweighed by any countervailing benefits to consumers or to competition; and is not an injury the consumers themselves could reasonably have avoided. An act or practice also is unfair if it offends an established public policy or is immoral,

unethical, oppressive, unscrupulous, or substantially injurious to consumers. An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions.

76. Defendants' actions constitute an "unfair" business practice because Defendants refused to allow Plaintiff to exercise his statutory right to accept a trade-in vehicle for value pursuant to Vehicle Code § 11709.4 and Civil Code § 2987.

77. Defendants' business practices are unfair because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers in that consumers are led being prevented from exercising the statutory rights alleged herein.

78. Additionally, conduct is "unfair" because it is tethered to a specific constitutional, statutory or regulatory provision. Here, Defendants' unfair conduct is tethered to its interference with Plaintiff's statutory rights pursuant to Vehicle Code § 11709.4 and Civil Code § 2987.

79. All of the acts and practices of Defendants as described in this complaint constitute "unfair" business acts and practices. A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. Plaintiff has suffered injury in fact and a loss of money or property as a result of Defendants' unfair business acts and practices as set forth herein.

80. Defendants' conduct is unfair because it prevents consumers from having any hope at all of capturing any of the equity in their lease, or terminating their lease early, unless the consumer pays out of their own pocket to pay the vehicle off, sells the vehicle to a GM dealership or trades the vehicle in at a GM dealership. From a practical perspective, consumers often lack the desire or liquidity to pay off the vehicles. As a result, consumers who wish to terminate their lease early or capture any of the equity in their lease are forced to do so at a GM dealership. This unfair and unlawful conduct harms competition, and

81. unfairly prevents non-GM dealerships' from transacting business.

82. As a direct and proximate result of Defendants' acts and practices in violation of the UCL, Plaintiff has suffered damages.

83. Defendants' conduct does not benefit consumers or competition. Plaintiff could not reasonably avoid the injury suffered or the injury that will be suffered. Defendants' conduct only benefits Defendants themselves.

84. The gravity of the conduct as described above outweighs the justification, motive, or reason therefor, is immoral, unethical, and unscrupulous, and offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, or is substantially injurious to the public, for the reasons set forth above.

85. Defendants could have and should have furthered its legitimate business interests by allowing non-GM dealerships to accept GM vehicles as trade-ins.

86. Defendants could have and should have furthered their legitimate business interests by abstaining from aggressively interfering with the statutory rights of competitor dealerships.

87. To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to Defendants' justification and motives for its conduct, and as to the impact of Defendants' conduct on Plaintiff and others.

88. Plaintiff and the Class lack an adequate remedy at law because Defendants' acts of unfair competition, as set forth above, present a continuing threat and will persist and continue unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs.

## **JURY DEMAND**

89. Plaintiff hereby demands a trial by jury on all issues of fact.

///

///

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

<u>First Cause of Action</u>

1. For an order enjoining Defendants from refusing to allow vehicle dealerships the ability to exercise their statutory right to accept vehicle trade-ins pursuant to Vehicle Code § 11709.4
2. Attorneys' fees and costs pursuant to Code of Civil Procedure § 1021.5
3. Pre-judgment interest; and
4. For other relief that this Court deems just and proper.

Date: September 15, 2022                              LAW OFFICE OF ROBERT L. STARR

<u>/s/ Adam Rose</u>
Attorney for Plaintiff
Calabasas Luxury Motorcars